UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
KATERIN ESCALANTE,                      :
                        Plaintiff,      :
                                        :        11 Civ. 375 (DLC)
            -v-                         :
                                        :        OPINION AND ORDER
MICHAEL J. ASTRUE, Commissioner of      :
Social Security,                        :
                        Defendant.      :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiff:

Charles E. Binder
Binder & Binder P.C.
60 East 42nd Street, Suite 520
New York, NY 10165

For defendant:

John E. Gura, Jr.
United States Attorney's Office
86 Chambers Street, 3rd Floor
New York, NY 10007


DENISE COTE, District Judge:

      Plaintiff Katerin Escalante ("Escalante") brings this

action pursuant to § 205(g) of the Social Security Act, 42

U.S.C. § 405(g), seeking review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her

eligibility for Supplemental Security Income ("SSI") benefits as

provided for under the Social Security Act ("the Act").  The

Commissioner has moved for judgment on the pleadings affirming

his final decision.  Escalante has cross-moved for remand for
further proceedings to address any legal error or to develop the
record.  For the following reasons, Escalante's motion is
granted.  The case is remanded to the Commissioner pursuant to
sentence four of 42 U.S.C. § 405(g) for further proceedings
consistent with this Opinion.

Background

     The following facts are taken from the administrative
record and are undisputed.  Escalante was born in 1989.  She
dropped out of school in the ninth grade.  Apart from
occasionally babysitting a young cousin, Ecalante has never
worked.  She claims that from June 3, 1990, she has suffered
from disabilities that leave her unable to work and thus
eligible for SSI benefits.  These are principally obesity,
asthma, headaches, and depression.  The record indicates that on
various occasions, Escalante has reported experiencing seizures
and auditory hallucinations.

I.  Medical Record

     Escalante lives with her parents, sisters, and brother in
the Bronx.  According to a report submitted by Escalante in
connection with her Social Security claim (and completed by
Escalante's mother, Elvira Lozado ("Lozado")), Escalante spends

most of her time inside the family's apartment, "drawing,
reading . . . sometimes playing video games[, and] always
listening to music."  While Escalante "sometimes goes outside
when it [sic] cool or cold," she has difficulty going outside by
herself, because "[s]he gets nervous and shy and uncomfortable."
The report states that Escalante "has trouble breathing, hearing
voice [sic] and sometimes sees things."  Escalante attended
special education classes until the eighth grade, and dropped
out of school in the ninth grade.

    The medical evidence in the record dates from May 1997,
when Escalante was taken to the emergency room at Beth Israel
Medical Center ("Beth Israel") for treatment following an acute
asthma attack.  Beth Israel doctors diagnosed acute asthma
exacerbation and an upper respiratory tract infection.
Escalante was treated with albuterol, and upon discharge was
prescribed penicillin, Tylenol, and Proventil syrup.

    The next medical record begins over six years later.  On
November 20, 2003, Lozada brought Escalante to the emergency
room of the Metropolitan Hospital Center ("MHC").  According to
the physician notes, Escalante stated that she had been "hearing
voices" for two days, "commanding [her] to hurt [her]self,
telling her to go away, and say[ing] derogatory things to her."
The examining physician at MHC noted that Escalante suffered
from obesity, that she had a history of developmental delay, and

that there was a significant family history of mental illness,
including two uncles and Escalante's younger sister.  Escalante
is described as an "obese female, shy, poor eye contact,
cooperative."  While reporting auditory hallucinations,
Escalante denied experiencing visual or tactile hallucinations.
The examining physician's global assessment of functioning
("GAF") diagnosis was 35,[1] and he admitted Escalante to MHC for
psychological inpatient treatment.  Escalante was discharged
from MHC in early December 2003 (the exact date is illegible).
The notes from her discharge are virtually illegible, but do
appear to indicate that Escalante had responded well to
treatment.  She no longer claimed to be hearing voices.  The GAF
diagnosis at discharge was 60.[2]

Over three years later, on March 20, 2006, Escalante was
admitted to the emergency department at the Lincoln Medical and
Mental Health Center ("Lincoln"), complaining of difficulty
breathing, chest pain, and asthma.  Lincoln's records indicate

---

[1] GAF refers to the individual's overall level of functioning,
and is assessed using the GAF scale, which provides ratings in
ten ranges.  Higher scores reflect greater functioning.  A GAF
of 31-40 is indicative of impairment in reality testing or
communication or major impairment in several areas, such as work
or school, family relations, judgment, thinking, or mood.
Diagnostic and Statistical Manual of Mental Disorders ( "DSM-IV-
TR" ) 27, 32, 34 (4th ed. text rev. 2000).

[2] A GAF in the range of 51-60 indicates moderate symptoms (such
as flat affect and circumstantial speech or occasional panic
attacks) or moderate difficulty in social, occupational, or
school functioning.  DSM-IV-TR 34.

that Escalante weighed 283 pounds.  She appeared to be in
"mild/moderate distress" with "wheezing/crackles".  The records
do not indicate any psychological abnormality; rather, Escalante
appeared "independent," "oriented to time, person and place,"
and had "normal speech."

From February to May 2006, Escalante attended mental health
treatment at Sound View Throgs Neck Community Mental Health
Center ("Sound View").  At Sound View, Escalante was treated by
psychiatrist Dr. Stewart Schwartz ("Schwartz") and social worker
Bernice Rivas ("Rivas").  The Sound View intake form and
interview notes from February 1, 2006 indicate that Escalante
had recently dropped out of school.  The interview notes reflect
that Escalante has "a complex, leading to social phobia and no
self-confidence due to being overweight."  Escalante was "alert,
appearing anxious and depressed[.]"  She reported "no delusions
[and] no hallucinations."  Her GAF diagnosis was 55.

Escalante attended four further appointments with either
Schwartz or Rivas at Sound View.  On March 9, 2006, she was
prescribed Zoloft, an antidepressant.  Between March 9 and May
4, however, Escalante cancelled six scheduled appointments.  On
May 4, Escalante and Lozada attended an appointment with
Schwartz.  Escalante indicated to Schwartz that she "fe[lt] a
little better" with the Zoloft.  Schwartz confronted Escalante
on her poor attendance record, which provoked an angry response

from Escalante.  According to Schwartz, Escalante "does not want to accept any responsibility for her . . . overeating even though she is nearly 17."  Schwartz noted that the plaintiff was "not psychotic" and increased her Zoloft dosage.  On May 8, Escalante and Lozada attended a session with Rivas, in which Escalante was described as alert and verbal.  Rivas discussed Escalante's lackluster attendance, which was attributed to Escalante's "social phobia and feelings about her weight." Lozada agreed that it might help if she traveled with Escalante to the sessions, at least until Escalante began to feel more comfortable in public.  Escalante told Rivas that she had not been experiencing delusions or hallucinations.  Escalante's last session at Sound View was with Rivas on May 22.  Escalante was described as "alert . . . normal mood."  The session focused on school and Escalante's goals.  Rivas wrote that Escalante was "not sure about choosing HS or GED, asking [Rivas] questions, [Rivas] providing [Escalante] with help, reinforcing her use of self-determination."  Again, no delusions or hallucinations were reported, and another appointment was scheduled.  Escalante did not attend this appointment, nor the three succeeding appointments scheduled thereafter.  There are no further records of Escalante attending therapy sessions at Sound View.

Beginning on December 31, 2001, Escalante's treating physician was Dr. Arpita Datta.  On February 27, 2009, following

Escalante's application for New York state disability benefits and SSI benefits, Dr. Datta completed a report on Escalante's condition and functional level.  According to Dr. Datta, since the end of 2001, she had seen Escalante approximately every three to four months.  As of early 2009, Escalante was 62 inches tall and weighed in excess of 300 pounds.  Her blood pressure was 140/90.  Dr. Datta's treating diagnoses were asthma and obesity.  For the asthma, Dr. Datta had prescribed Albuterol, Singulair, and use of a nebulizer.  Escalante's experienced asthma attacks "intermit[edly][,] once to twice [per] year."  In 2008, Escalante experienced only one acute asthma attack, but no "severe" attacks requiring a hospital visit.  On January 23, 2009, however, the date of Dr. Datta's last examination, Escalante had exhibited wheezing.  According to Dr. Datta, Escalante's only physical problems were "obesity and mild, intermittent asthma."  Escalante was "otherwise normal." Furthermore, Dr. Datta indicated that Escalante's asthma responded well to the Albuterol that had been prescribed.

From a mental standpoint, Dr. Datta wrote that as of her most recent examination, Escalante displayed normal attitude, behavior, speech, thought, mood, and affect.  Dr. Datta's functional assessment of Escalante was that Escalante had a "normal" ability to perform the "activities of daily living," and a "normal" ability to "function in a work setting."  Dr.

Datta did not complete the section of the form pertaining to Escalante's ability to carry out work-related physical activities such as lifting/carrying or standing/walking.  She did indicate that Escalante had "no limitation" in understanding and memory, sustained concentration, and social interaction. Nevertheless, Dr. Datta checked a box at the end of the form indicating that she could not "provide a medical opinion regarding this individual's ability to do work-related activities."  Dr. Datta concluded the form by stating that Escalante should seek to "lose weight and lead a healthy life by surgery or dieting."

Escalante applied for SSI on January 28, 2009.  She visited two consulting examiners in early 2009 while she was applying for disability benefits.  Dr. Herb Meadow, a psychiatrist, examined Escalante and reported on her mental health.  According to Dr. Meadow, Escalante came to the examination by taxi with Lozada, but stated that she could take public transportation on her own.  In his report, Dr. Meadow states that Escalante has difficulty sleeping and "gets depressed at times with dysphoric moods".  While "she states she still occasionally hears voices . . . what she actually describes are hypnopompic and hipnagogic phenomena."  While Dr. Meadow found Escalante to be depressed, he described her "manner of relating [as] adequate" and her "cognitive functioning [as] low average."  Dr. Meadow found that

Escalante "would benefit from psychiatric treatment," but he nevertheless found that Escalante "would be able to perform all tasks necessary for vocational functioning."

Dr. Marilee Mescon, a specialist in internal medicine, performed a consultative examination on March 24, 2009.  Dr. Mescon's examination focused on Escalante's asthma and obesity. At the time of the examination, Escalante was 60 inches tall and weighed 310 pounds.  Escalante told Dr. Mescon that her home nebulizer helped suppress her asthma attacks, and that she had not had a serious attack provoking a trip to the hospital in two years.  Escalante did indicate to Dr. Mescon that when Escalante "is exposed to dust and when she has an upper respiratory tract infection, her asthma gets worse."  Dr. Mescon wrote that Escalante is "a very pleasant, well-nourished, well-developed obese woman in no respiratory distress [who is able] to speak in full sentences."  While demonstrating "some difficulty walking on her heels and toes," Escalante "[n]eeded no help changing for [the] exam or getting on and off the exam table.  [She was able] to rise from [her] chair without difficulty."  Dr. Mescon concluded, based on her examination, that "there would be no limitations in the claimant's capacity to sit or stand for short periods of time, but her ability to climb, push, pull, or carry heavy objects would be severely limited because of her obesity."

Escalante's SSI claim was denied at the initial administrative review stage, and Escalante requested a hearing before an Administrative Law Judge ("ALJ").  Escalante's hearing before ALJ Susan Wakshul took place on May 7, 2010.  The ALJ appeared by videoconference from Baltimore, while Escalante testified in New York.  Lozada also briefly testified at the hearing.  The final witness was Alina Kurtanich ("Kurtanich"), a vocation expert.

At the hearing, Escalante testified that she could not get work because she was "severely overweight," had "trouble getting up," and was "afraid of going outside because people make fun" of her.  She stated that Dr. Datta was her "regular doctor", but that she had recently seen a neurologist, Dr. Lyzette Velazquez for help with "chronic headaches."  Escalante also testified that she experienced seizures, described as a "shocking [sensation]" in her head, and headaches of varying severity, which she testified she experienced most days of the week, and took Tylenol or Advil to alleviate.  Escalante testified that she had difficulty sleeping, but that she had been prescribed Topamax, which seemed to help.[3]  The Topamax also helped stop the "shocking" in her head.  Escalante further indicated that she had undergone an electroencephalogram ("EEG") test the week

_____

[3] Escalante identified Dr. Velazquez as the doctor prescribing her "medicine for trouble sleeping and seizure [sic]."

before at the behest of her doctor, in response to Escalante's description of her "seizures".  The EEG results had not yet come in, and the ALJ directed Escalante to send a copy of the test results for inclusion in the administrative record.

In the course of her testimony, Escalante stated that while she gets tired after walking more than a block, she takes public transportation twice a week to visit the doctor.  Otherwise, she does not leave her home.  Escalante occasionally helps out with household chores like cooking, and tends to her own personal hygiene needs.

Lozada briefly testified that Escalante "hear[s] voices and sees things."  Following her mother's testimony, Escalante stated that she did "hear[] voices and see[] things", but "not . . . quite as much as last year."

A vocational expert, Ms. Kurtanich, was the third witness at Escalante's hearing.  The ALJ first asked Kurtanich whether jobs existed in the national economy for a person with no work experience who could only perform "light work" as defined in the Dictionary of Occupational Titles ("DOT"), with the following further limitations:  "occasionally climb ramps and stairs; should never climb ropes, ladders, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to environmental pollutants and extremes in temperature."  Kurtanich responded that such an

11

individual could perform work as a ticket taker, an electronic worker, and a garment sorter, as those positions are defined in the DOT.

The ALJ then asked Kurtanich whether this answer would change if the individual in question would only have occasional contact with coworkers, the public, and supervisors. Kurtanich responded that this would eliminate the position of ticket taker.

After the hearing, Escalante submitted a copy of her EEG report to the ALJ. The report is signed by Dr. Velazquez, and indicates that Escalante was referred by Dr. Datta. Escalante's EEG was normal.


II.   The ALJ's Decision

The ALJ issued her decision on May 20, 2010. The ALJ found that Escalante was not disabled within the meaning of the Act since the date of her application, and was therefore not entitled to benefits.

The ALJ found that Escalante suffered from several "severe" impairments, including obesity, asthma, depression, and headaches. The ALJ noted that Escalante claimed to have experienced seizures, but that Escalante's EEG was normal. The ALJ therefore determined that what Escalante claimed to be

seizures were not reasonably related to a medically determinable impairment.

The ALJ did not find that Escalante's impairments, whether singly or in combination, meet or are medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix. 1.  The ALJ also found that Escalante's mental impairments did not meet the criteria for a listed impairment. The ALJ based her analysis almost entirely on Escalante's own testimony about the scope of her impairment.

The ALJ next concluded that Escalante had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967, with the further physical and social limitations that the ALJ posed in her hypothetical to Kurtanich during the hearing.  In reaching the RFC assessment, the ALJ considered both the medical record before her and Escalante's own testimony.  For the scope, severity, and limiting effects of Escalante's obesity, asthma, and headaches, the ALJ relied upon the report of Dr. Datta, the treating physician, and Dr. Mescon, the consulting examiner.  For impact of Escalante's depression and alleged psychosis, the ALJ afforded little weight to Dr. Meadows' assessment of Escalante, because the ALJ found that Dr. Meadows' opinion that Escalante could perform all tasks necessary for vocational functioning was belied by his own clinical finding that Escalante suffered from a depressive

disorder.  While Dr. Datta's report indicated that Escalante's mental impairments would not prevent her from functioning normally, the ALJ does not appear to have relied upon this assessment.  Finally, the ALJ found Escalante's own testimony generally credible on the symptoms she had been experiencing, but the ALJ found that Escalante's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" to the extent they were inconsistent with the ALJ's findings on Escalante's RFC.

At the final step of the inquiry, the ALJ found that jobs exist in the national economy in significant numbers for a person with Escalante's RFC.  As Kurtanich had testified, the ALJ found that Escalante could perform the jobs of electronics worker or garment sorter.  The ALJ therefore denied Escalante's application for benefits, finding that she was not disabled within the meaning of the Act since the date of her application.

Escalante requested review by the Social Security Administration Appeals Council ("Appeals Council") on July 23, 2010.  To supplement her review petition, Escalante submitted a form signed by Dr. Rachana Chowlera, which indicates that Escalante suffers from morbid obesity, hypertension, hyperlipidemia, hyperglycemia, and arthralgia.  The typed form indicates that Escalante has applied for SSI benefits, and states: "Please fulfill patient's request in order to avoid

14

exacerbation of his/her medical condition(s)."  Additionally, the administrative record also includes the report of a magnetic resonance imaging scan (MRI) conducted on Escalante on April 2, 2010.  The MRI was ordered by Dr. Velazquez.  The ALJ's decision does not mention the MRI, and neither party attempts to construe its findings.

On December 22, 2010, the Appeals Council denied Escalante's request for review of the ALJ's decision.  Escalante filed this action on January 10, 2011.  Escalante and the Commissioner filed cross-motions for judgment on the pleadings on September 14 and September 15, respectively.  Neither party filed an opposition to the other party's motion.


Discussion

I.  Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence.  Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."
Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting
Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Furthermore,
if the findings of the Commissioner as to any fact are supported
by substantial evidence, those findings are conclusive.  Diaz v.
Shalala, 59 F.3d 307, 312 (2d Cir. 1995).  "Where there is
substantial evidence to support either position, the
determination is one to be made by the factfinder."  Alston v.
Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

     The Commissioner will find a claimant disabled under the
Act if the claimant demonstrates the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or that has lasted or can be expected to last
for a continuous period of not less than 12 months."  42 U.S.C.
§ 423(d)(1)(A).  The claimant's impairment must be "of such
severity that he is not only unable to do his previous work but
cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work which
exists in the national economy."  Id. § 423(d)(2)(A).  The
disability must be "demonstrable by medically acceptable
clinical and laboratory diagnostic techniques."  Id.
§ 423(d)(3).

The Commissioner uses a five-step process when making
disability determinations.  See 20 C.F.R. §§ 404.1520 & 416.920.
The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe
> impairment" that significantly limits her physical or
> mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the
> claimant has an impairment that is listed in 20 C.F.R.
> Part 404, Subpart P, Appendix 1.  Assuming the
> claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe
> impairment, she has the residual functional capacity
> to perform her past work.  Finally, if the claimant is
> unable to perform her past work, the burden then
> shifts to the Commissioner to determine whether there
> is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003)
(citation omitted).

A claimant bears the burden of proof as to the first four
steps, while the Commissioner bears the burden in the final
step.  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  For
evaluating the severity of mental impairments, there are
additional regulations that require the implementation of a
"special technique" that involves rating and documenting the
degree of functional limitation resulting from the impairments
in accordance with "four broad functional areas: (1) activities
of daily living; (2) social functioning; (3) concentration,
persistence, or pace; and (4) episodes of decompensation."

Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (citing 20
C.F.R. § 404.1520a(c)(3)).

With respect to the determination of the nature and
severity of a claimant's impairment,

> [t]he SSA recognizes a "treating physician" rule of
> deference to the views of the physician who has
> engaged in the primary treatment of the claimant.
> According to this rule, the opinion of a claimant's
> treating physician as to the nature and severity of
> the impairment is given "controlling weight" so long
> as it is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is
> not inconsistent with the other substantial evidence
> in [the] case record.

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation
omitted).  In general, "the opinion of the treating physician is
not afforded controlling weight where . . . the treating
physician issued opinions that are not consistent with other
substantial evidence in the record, such as the opinions of
other medical experts."  Halloran, 362 F.3d at 32 (citation
omitted).

> An ALJ who refuses to accord controlling weight to the
> medical opinion of a treating physician must consider
> various "factors" to determine how much weight to give
> to the opinion.  20 C.F.R. § 404.1527(d)(2).  Among
> those factors are: (i) the frequency of examination
> and the length, nature and extent of the treatment
> relationship; (ii) the evidence in support of the
> treating physician's opinion; (iii) the consistency of
> the opinion with the record as a whole; (iv) whether
> the opinion is from a specialist; and (v) other
> factors brought to the Social Security
> Administration's attention that tend to support or
> contradict the opinion.  The regulations also specify
> that the Commissioner "will always give good reasons

in [her] notice of determination or decision for the
weight [she] give[s] [claimant's] treating source's
opinion.

Id. (citation omitted).  After considering these factors, the
ALJ must "comprehensively set forth [his] reasons for the weight
assigned to a treating physician's opinion."  Id. at 33.
Failure to provide good reasons for not crediting the opinion of
a claimant's treating physician is a ground for remand.
Burgess, 537 F.3d at 129.  "Genuine conflicts in the medical
evidence," however, "are for the Commissioner to resolve."
Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

In making such an evaluation, an ALJ must also "carefully
consider the individual's statements about symptoms" along with
all of the other evidence in the case record, and must make
findings about the credibility of the claimant's statements.
See Evaluation of Symptoms in Disability Claims:  Assessing the
Credibility of an Individual's Statements, Soc. Sec. Ruling 96-
7p, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996).  "An
individual's statements about the intensity and persistence of
pain or other symptoms or about the effect the symptoms have on
his or her ability to work may not be disregarded solely because
they are not substantiated by objective medical evidence."  Id.
An ALJ will consider the following factors when evaluating a
claimant's symptoms: (1) the claimant's daily activities; (2)
the location, duration, frequency, and intensity of the

claimant's pain or other symptoms; (3) precipitating and
aggravating factors; (4) the type, dosage, effectiveness, and
side effects of any medication the claimant takes or has
received for relief of his pain or other symptoms; (5)
treatment, other than medication, the claimant receives or has
received for relief of his pain or other symptoms; (6) any
measures the claimant uses or has used to relieve his pain or
other symptoms; and (7) other factors concerning the claimant's
functional limitations and restrictions due to pain or other
symptoms.  20 C.F.R. § 416.929(c)(3).  Conclusory findings of a
lack of credibility will not suffice; rather, an ALJ's decision
"must contain specific reasons for the finding on credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and to any
subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight."  Soc.
Sec. Ruling 96-7p, 61 Fed. Reg. at 34,484.

A finding of credibility made by an ALJ is entitled to
deference by a reviewing court.  The ALJ, "after weighing
objective medical evidence, the claimant's demeanor, and other
indicia of credibility . . . may decide to discredit the
claimant's subjective estimation of the degree of impairment."
Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (citation
omitted).  As with any finding of fact, "[i]f the Secretary's

findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Perez v. Barnhart, 234 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (quoting Aponte v. Sec'y Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).  Thus, a determination of credibility will only be set aside if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

II.  The ALJ Hearing and Decision

     Escalante makes four arguments in urging remand.  She argues that the ALJ failed to adequately develop the record and to properly consider Escalante's obesity in assessing Escalante's RFC.  She also argues that the ALJ committed legal error in her evaluation of Escalante's credibility and that the ALJ relied upon flawed vocational expert testimony.  Because the ALJ failed to adequately develop the record with respect to Escalante's treatment by Dr. Velazquez, remand to the Commissioner is necessary.

     "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Burgess v.

Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted).
"[W]here there are deficiencies in the record, an ALJ is under
an affirmative obligation to develop a claimant's medical
history . . . ." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir.
1999).  Where those deficiencies occur in connection with
records of an applicant's treating physician, the ALJ's
affirmative obligation is especially strong.  See Genier v.
Astrue, 606 F.3d 46, 50 (2d Cir. 2010) (per curiam) (directing
ALJ on remand to solicit statement and opinion from treating
physician); Clark v. Comm. of Social Security, 143 F.3d 115, 118
(2d Cir. 1998) ("The law gives special evidentiary weight to the
opinion of the treating physician."); Schaal, 134 F.3d at 505
("[I]f the clinical findings were inadequate, it was the ALJ's
duty to seek additional information from [the treating
physician] sua sponte.").

     At the hearing, Escalante told the ALJ that she had two
"primary doctors", Dr. Datta and Dr. Velazquez.  Indeed, in
giving her testimony, Escalante referred more frequently to Dr.
Velazquez.  The ALJ requested that Escalante provide the results
of the EEG, but did not inquire further.  As Escalante's
treating neurologist, Dr. Velazquez could be expected to provide
insight into the least developed and most disputed aspect of the
record:  the assorted neurological impairments, including
auditory hallucinations, seizures, sleeplessness, and the

headaches that Escalante claims she suffers.  Under these circumstances, the ALJ had an affirmative obligation to seek the opinion of Dr. Velazquez, Escalante's other treating physician and the one whom Escalante represented had the most recent insight into Escalante's mental condition.  Failure to so inquire constitutes legal error, and requires remand.

Escalante's remaining contentions may be briefly addressed. Escalante's second argument, that the ALJ failed to consider the effect of Escalante's obesity on her other impairments, is meritless.  The record contains ample evidence of the extent of Escalante's physical impairments, most notably obesity and asthma, and the impact these conditions have on her ability to perform various tasks.  The ALJ explicitly took Escalante's obesity and asthma into account in analyzing her RFC.

Escalante is likewise incorrect that the ALJ failed to properly evaluate her credibility as a witness.  When the record is supplemented with the evidence from Dr. Velazquez, however, it will be necessary to reevaluate Escalante's credibility in light of the expanded record.

Finally, Escalante takes issue with the ALJ's reliance on the vocational expert's testimony.  The DOT does not address whether individuals who require the ability to sit and stand at will ("sit/stand option") are capable of performing a given occupation.  SSR 83-12 (1983).  Here, at the behest of the ALJ,

the vocational expert considered whether jobs classified as light work in the DOT, with additional limitations including requiring a sit/stand option, exist in significant numbers in the national economy.  In responding, the expert appeared to rely solely upon the DOT.  In any proceedings on remand, the ALJ should seek clarification from the vocational expert as to the basis for any testimony that specific jobs that may be appropriate for Escalante may be performed with a sit/stand option.

Conclusion

     The Commissioner's September 15, 2011 motion for judgment on the pleadings is denied.  Escalante's September 14, 2011 motion for judgment on the pleadings is granted.  The case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion.  This judgment disposes of the action.  See Sullivan v. Finkelstein, 496 U.S. 617, 624-25

(1990).  The Clerk of Court shall close the case.

      SO ORDERED:

Dated:    New York, New York
           January 4, 2012

                            DENISE COTE
                    United States District Judge

25